LANDRY, Judge.
This wrongful death action by Leola Brooks Guillory, seeking damages for the death of her father, Joe Brooks, and two cases consolidated herewith, arise from an automobile accident which occurred in the early morning hours of June 19, 1971. The accident happened on La. Highway 43 (the Springfield-Albany Road), a two-laned paved highway running in a northerly-southerly direction in Livingston Parish. The accident involved a state police vehicle parked facing south in the northbound lane of travel, with its lights burning, while its driver, Trooper Charles Abels, was investigating a vehicle owned and operated by David Hutchinson, which vehicle was stopped with its rear wheels in the northbound lane facing in a more or less easterly direction. Positioned as noted, the police car was struck on its left front and left side by a northbound vehicle being driven by Mrs. Dorothy Hollie. The right front seat of the police unit was occupied by Causey Armstrong, whom Trooper Abels had previously arrested and handcuffed for driving while intoxicated. After striking the police vehicle, the Hollier vehicle proceeded along the east shoulder of the highway striking and killing Joe Brooks, a pedestrian walking in that area. Causey Armstrong instituted Suit Number 9755 on our docket, against Travelers Insurance Company (insurer of the police vehicle), and others, seeking damages for personal injuries. Alice Brooks, widow of decedent, Joe Brooks, filed Suit Number 9754, against Travelers and others, for damages on behalf of herself and two minor children of her marriage to decedent. All plaintiffs were awarded judgment based on the finding that Mrs. Hollie and Abels were both guilty of negligence constituting a proximate cause of the accident. Leola Brooks Guillory was granted $7,500.-00 for loss of the love, affection and support of her father. Causey Armstrong was granted $300.00 for personal injuries. Mrs. Brooks was given substantial awards for herself and minor children. Travelers appealed seeking reversal of all judgments. *254 Alternatively, Travelers asked for reduction in the awards. After oral argument before this court, the suits of Mrs. Brooks and her children and that of Causey Armstrong were compromised and voluntarily dismissed on joint motion of all parties concerned.
We are, therefore, concerned herein only with Travelers’ appeal of the judgment in favor of Leola Brooks Guillory. Mrs. Guillory has appealed praying for an increase in her award. Mrs. Hollie did not appeal. We affirm.
Appellant-Travelers assigns the following errors: (1) The trial court erroneously held Abels guilty of negligence; (2) Alternatively, the lower court improperly held Abels’ negligence was a proximate cause of the accident; (3) The lower court incorrectly concluded Joe Brooks was not guilty of either contributory negligence or assumption of risk, and (4) The trial court erred in granting plaintiff, Leola Brooks Guillory, excessive damages.
Certain basic, relevant facts are undisputed. Shortly before 2:30 A. M., on the date in question, Officer Abels had arrested Causey Armstrong for driving while intoxicated. Abels was en route to the Livingston Parish Jail with Armstrong handcuffed and seated next to Abels. Decedent Brooks, a passenger in Armstrong’s vehicle when Armstrong was arrested, was seated on the rear seat of the police vehicle with Abels’ permission. Abels intended to return Brooks to Brooks’ home after incarcerating Armstrong. As Abels was traveling northerly with his prisoner and guest passenger, he noted erratic driving by a southbound motorist. Concluding the driver of the southbound automobile was intoxicated, Abels decided to turn around, follow the vehicle, and place it under surveillance. Brooks, either lived at some place south of the point where Abels turned around, or intended to spend the night with an in-law who lived somewhere near Brooks’ home. When Abels commenced following the southbound motorist, Brooks requested to be let out of the vehicle so that he could proceed on foot to his ultimate destination. Brooks told Abels he would walk home, but requested Abels to be on the lookout for him when Abels returned from Livingston if Brooks were still walking home. Abels then proceeded southerly a distance of five-tenths of a mile (the distance being determined by subsequent measurement), at which point Abels came upon Hutchinson’s vehicle stopped in the northbound lane facing in an easterly direction with its front wheels off the highway, and its rear wheels on the traveled portion of the roadway. Abels then parked his police car in the northbound lane of travel at an undisclosed distance north of the Hutchinson vehicle. Abels did so to illuminate the Hutchinson car with the headlights of Abels’ own vehicle. He explained he wanted the advantage of having the occupants of the stopped vehicle being blinded by the lights of the police unit as they approached him at the scene. He further elucidated that he was alone, he already had one prisoner, and did not know what to expect from the occupants of the stalled automobile. Abels left the left door of his vehicle open so that the interior dome light would remain on thus enabling him to keep his prisoner, Armstrong, under observation while he investigated the stalled vehicle. The Hutchinson vehicle was being driven by its owner, who was accompanied by Alden A. Hoover and Miss Brenda Bankston, who was seated on the front seat between the two men. Abels approached the Hutchinson car, ordered Hutchinson to exit the vehicle, place his hands on top of the vehicle, and produce his driver’s license. Abels then proceeded to interrogate Hutchinson to verify his preliminary determination that Hutchinson was intoxicated. Hoover got out of the car and approached Abels. After ascertaining Hoover to be relatively sober, Abels directed Hoover to move the stalled vehicle from the highway. Hoover experienced difficulty with the gears of the car, but ultimately succeeded in driving the vehicle down into a sloping *255 ditch on the east side of the highway until the vehicle was completely clear of the traveled portion of the road.
Brooks arrived at the scene while Officer Abels was continuing his investigation. After again requesting Abels to pick him up if he was still walking on Abels’ return from Livingston, Brooks departed, apparently along the east shoulder of the highway in a northerly direction. At this time, the Hollie vehicle approached from the south traveling northerly in its proper lane at a speed of 40 to 50 miles per hour. Mrs. Hollie was driving, accompanied by her son, Hilton, who was home on leave from military duty. When Mrs. Hollie got near the police car, she realized it was not southbound in its proper lane as she previously thought, but was stopped in the wrong lane. She then attempted to veer to the right to pass on the east shoulder of the highway. However, the left side of her car struck the left front and left side of the police car and continued northerly along the east shoulder striking Brooks, the precise point of impact being undetermined. The Hollie vehicle then came to rest approximately 130 feet north of the point of impact with the police car.
The police car was not equipped with a top mounted flashing dome light customarily found on such vehicles. Instead the car was equipped with four flashing red lights, each measuring four inches in diameter, two mounted on the front grill of the vehicle between the headlights, and two mounted in the rear window. The principal and crucial disputed fact is whether Trooper Abels activated the red flashing lights prior to the accident. Abels testified that, as a matter of habit, he always turned these warning lights on when he stopped to investigate an incident. The remaining witnesses, all occupants of the Hutchinson and Hollie vehicles, testified they did not see the flashing red lights until after the accident occurred.
In essence Abels testified that the switch which operated the flashing warning lights was located near the steering wheel. The switch was operated merely by pulling a control forward. After getting out of his car, he left the door open to illuminate its interior. He then pulled the switch turning on the warning lights. After Hoover had removed the Hutchinson car from the traveled portion of the highway, Abels noted the Hollie car approaching from the south traveling at a rapid rate of speed. At this time, he was standing about 30 feet in front of his vehicle in the northbound lane or east half of the road. He first observed the Hollie car start across the cen-terline of the highway as though to pass in the southbound lane. At this point, Abels started toward the eastern shoulder of the road. Suddenly the Hollie car veered toward the east side of the highway. Abels then yelled to the others to “jump”, and he himself changed directions and started toward the west side of the highway. The Hollie car passed to the east of him when he was about at the centerline of the highway. Abels turned to look, saw the Hollie car strike the open door of the police car and immediately thereafter saw something flying through the air. He thought Hutchinson had been struck. After ascertaining that Hutchinson was safe (not knowing that Brooks had been struck), Abels went to his unit to radio for assistance. He found the left door jammed shut because of damages received in the collision. He also found the door glass was completely gone. He reached into the vehicle through the window, obtained his radio microphone and called for help. Thereafter it was discovered that Brooks had been struck by the Hollie car.
Mrs. Hollie testified she was proceeding northerly at about 40 to 50 miles per hour when she noted the oncoming car with four white, brightly burning headlights. She, at first, thought the oncoming vehicle was on its proper side of the road and dimmed her headlights, but the approaching vehicle did not respond. When she noted the vehicle was stopped on the wrong side of the road, she attempted to apply her brakes, but saw that she could not stop in time. She then left the road on her *256 right to avoid a collision, but she hit the parked vehicle anyway. When her car came to rest, she looked back and saw a policeman. When the policeman reached his vehicle, she saw some red lights on the car. She did not see any red lights on the police unit until the officer reached his vehicle.
David Hutchinson testified in substance that he could not say one way or the other whether the red warning lights were burning on the police unit prior to the accident. He did, however, note these warning signals were burning after the collision.
Alden Hoover’s testimony was to the effect that after the collision, he saw Trooper Abels turn on the warning red lights on his vehicle.
Miss Brenda Bankston’s testimony was, in substance, that she did not recall seeing any warning lights on the police unit until after the accident.
Hilton Hollie testified that the red lights were not burning on Trooper Abels’ car before the collision. He also testified that after helping his mother out of her car, he was standing near that vehicle and saw the red lights on the police car come on.
Lt. Ralph D. Powers, State Police, investigated the accident because of Trooper Abels’ involvement. He found the left side of the police car heavily damaged. He concluded that from the nature and extent of the damage, and the placement of the red warning light switch near the damaged door, it would have been extremely difficult, if not impossible, for the warning lights to have been turned on after the collision.
Travelers strenuously contends the trial court erred in finding as a fact that Trooper Abels did not activate his red warning lights prior to the collision. Travelers so argues on the ground that the testimony is conflicting on the part of the witnesses upon whom the trial court relied in reaching its conclusion. It is appellant’s position that the preponderance of credible testimony, considered with .the demonstrated inaccessibility of the light switch, establishes that the warning lights were in fact burning before the accident. In his reasons for judgment, the trial court noted he had no reason to question Abel’s integrity. The trial court also noted that Abels had been on duty more than 12 hours at the time of the accident, and further observed, in effect, that in the excitement generated by the series of incidents, Abies could be mistaken about having turned on the warning lights. In addition, the trial judge noted he could not disregard the testimony of the other witnesses, and concluded the lights were not turned on until after the accident. We find no manifest error in this conclusion.
We pretermit consideration of Abies’ negligence assuming his warning lights were burning. We conclude, as did the trial court, that Abels was indeed negligent in parking his vehicle in the manner indicated with nothing but his normal headlights in operation. The condition thus created was manifestly fraught with danger to the traveling public. The scene was an open rural highway. It was dark. The police unit was parked in the wrong lane of travel facing oncoming traffic with its headlights on so as to constitute a virtual trap to a northbound motorist.
Travelers next contends that Abels’ negligence, if any, was not a proximate cause of Brooks’ death. It is suggested that LSA-R.S. 32:141, which prohibits improper parking on highways, is inapplicable to Brooks, a pedestrian, because the statute was intended to impose a duty to other motorists only. On this basis, it is suggested that Brooks’ injury and death is not within the ambit of the statute’s protection, consequently, the violation is a remote and not a proximate cuase of Brooks’ death. In so contending, Travelers relies upon the following appearing in Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714:
“To decide whether the violation of the criminal statute . . . imposes civil *257 liability ... we must determine whether his act was a cause-in-fact of the accident, what was the nature of the duty imposed upon him, what risks were encompassed within that duty, and whether under the combination of these considerations he should be declared negligent.”
Travelers argues that subject statute imposes duties and protects against risks only to other motorists and their passengers, and cannot be extended to pedestrians merely walking along or near a public highway.
The duty-risk aspect of the relationship of civil liability to criminal negligence was fully discussed in Laird, above, both in the majority and concurring opinions. Laird, above, also involved an interpretation of LSA-R.S. 32:141, which regulates stopping, standing or parking on highways outside business or residential districts. We find nothing in Laird which limits the application of the statute, and the duty therein imposed on a motorist to other motorists and occupants of other vehicles. Such a restrictive interpretation would be manifestly unreasonable in that it would bar recovery by a pedestrian within reasonable proximity to an accident caused by a violation of the nature here involved. We conclude that LSA-R.S. 32:141 intends to protect not only other motorists and the occupants of other vehicles using the highways, but also to make our highways, including their shoulders and roadbeds, safe for all users, motorists and pedestrians alike. Decedent was not violating any law when he happened upon the scene. He had every legal right to depart the scene as he did, using either the shoulder or ditch as his avenue of departure. We believe it to be reasonably foreseeable that Abels’ negligence could lead to an accident resulting in injuries to persons or property within a reasonable distance of his vehicle. We find that Abels’ negligence was a proximate cause of Brooks’ injury and death.
Travelers’ next contention is that Brooks was contributorily negligent in re-maining at the scene. It is suggested that if Abies negligently created a dangerous situation on the highway, Brooks was con-tributorily negligent, or assumed the risk, by remaining at the scene after making his request of Abels. Travelers maintains that Brooks knowingly exposed himself to danger, and is therefore precluded from recovery. In so arguing, Travelers relies upon Romano v. Juneau (Bonstaff), 198 So.2d 499 (4th La.Appeal, 1967); Gantt v. Brown, 191 So.2d 793 (2nd La.App., 1966), writs refused 250 La. 19, 193 So.2d 529 (1967); Vaughn v. Cortez, 180 So.2d 796 (3rd La.App., 1965); and Carter v. Travelers Insurance Company, 176 So.2d 176 (4th La.App., 1965). It is basic law that contributory negligence and assumption of risk are issues determinable in the light of the facts and circumstances of each particular case. Our consideration of the cited authorities reveals that, while they apply the rule relative to assumption of risk, the facts in each are not apposite to those in the case at hand. For example, Romano, above, involved a construction worker with twenty-five years experience in the trade. The workman fell from a roof he was attempting to repair, despite the existence of debris on the roof. In Gantt, above, the injured plaintiff positioned himself to the rear of a road grader where he could not be observed by the operator. In Carter, above, the injured party was struck by the handlebar of a policeman’s motorcycle as the officer was attempting to clear a pathway for a carnival parade. Here Brooks, a pedestrian, lawfully proceeding on the highway, came upon the scene of an accident. He was in the act of departing at the time he was struck. Under the circumstances, we find no ground for applying the doctrine of assumption of risk in this instance.
We find no basis for either increasing the award, as requested by plaintiff, Leola Brooks Guillory, or decreasing same as prayed for by Travelers. The evidence discloses that decedent frequently gave his plaintiff daughter $10.00 to $20.00 cash in addition to groceries in various *258 amounts and other food items. The record further shows that plaintiff’s husband is disabled, and that the support plaintiff received from her now deceased father was indispensable to plaintiff’s maintenance.
It is axiomatic that in the award for damages considerable discretion is vested in the trial judge, C.C. art. 1934(3), and the same should not be increased or decreased on appellate review unless such award is found to be either grossly inadequate or excessive so as to amount to an abuse of the discretion vested in the trier of fact. Redd v. Prevost, 288 So.2d 74 (4th La.App.1974).
In the instant case, we do not find that the damages awarded to plaintiff are so inadequate as to justify our conclusion that the trial judge did, in fact, abuse the discretion accorded to him in such matters. Neither do we find the award manifestly excessive as contended by Travelers.
The judgment of the district court is affirmed at the cost of appellant, Travelers Insurance Company.
Affirmed.